UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| DEREK A. MARKLE and | ) | |
| BECKY A. MARKLE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | 10-40189-FDS |
| | ) | |
| HSBC MORTGAGE CORPORATION | ) | |
| (USA), | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

SAYLOR, J.

This is a breach of contract case arising out of a government program intended to promote the modification of home mortgage loans and help homeowners avoid foreclosure. After plaintiffs Becky and Derek Markle fell behind on home mortgage payments, their mortgage servicer, defendant HSBC Mortgage Corporation, referred their home to foreclosure. The Markles allege that HSBC instituted foreclosure proceedings in violation of its obligations under the Home Affordable Modification Program. They assert claims for breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, and violation of the Consumer Protection Act, Mass. Gen. Laws ch. 93A. Jurisdiction is based on diversity of citizenship.

HSBC has moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). For the following reasons, the motion will be granted.

## I.    Statutory and Regulatory Background

Congress enacted the Emergency Economic Stabilization Act in the midst of the financial

crisis of 2008.  *See* Pub. L. No. 110-343, 122 Stat. 3765 (codified as amended at 12 U.S.C. §§

5201 *et seq.*).  The centerpiece of the statute, the Troubled Asset Relief Program ("TARP"),

delegated to the Secretary of the Treasury broad powers to mitigate the impact of the foreclosure

crisis and preserve homeownership.  12 U.S.C. §§ 5201, 5211-5241.  One component of TARP

requires the Secretary to "implement a plan that seeks to maximize assistance for homeowners

and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . .

available programs to minimize foreclosures."  *Id.* § 5219(a).  Congress also granted authority to

"use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable

foreclosures."  *Id.*[1]

    Acting under this authority, the Secretary introduced the "Making Home Affordable

Program" in February 2009.[2]  Within this initiative is the "Home Affordable Modification

Program" ("HAMP"), which is administered by Fannie Mae.  HAMP aims to provide relief to

borrowers who have defaulted on their mortgage payments or who are likely to default by

reducing mortgage payments to sustainable levels.  (*See* Compl., Ex. A, Fannie Mae

Announcement 09-05R ("Announcement 09-05R"), at 1).  Under HAMP, loan servicers receive

incentive payments for each permanent loan modification completed.  (*Id.* at 30).  HAMP

---

[1] Section 109(c) of the statute, entitled "Consent to Reasonable Loan Modification Requests," provides:

> Upon any request arising under existing investment contracts, the Secretary shall consent, where appropriate, and considering net present value to the taxpayer, to reasonable requests for loss mitigation measures, including term extensions, rate reductions, principal write downs, increases in the proportion of loans within a trust or other structure allowed to be modified, or removal of other limitation on modification.

12 U.S.C. § 5219(c).

[2] The Department of the Treasury created the Making Home Affordable Program jointly with the Federal Housing Finance Agency, the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac").

modifications derive from a uniform process designed to identify eligible borrowers and render their debt obligations more affordable and sustainable.

Mortgage lenders approved by Fannie Mae must participate in HAMP.  (Announcement 09-05R, at 1).  This obligation stems from the Mortgage Selling and Servicing Contract ("MSSC"), a form contract entered into by Fannie Mae and approved lenders that establishes the parties' basic legal relationship.[3]  The contract incorporates by reference Fannie Mae's Selling and Servicing Guides.[4]  The latter guide requires servicers of mortgage notes owned by Fannie Mae to participate in HAMP and to abide by HAMP directives and guidelines.  *See Speleos v. BAC Home Loans Serv., L.P.*, 755 F. Supp. 2d 304, 306 (D. Mass. 2010); *McKensi v. Bank of America, N.A.*, 2010 WL 3781841, *2 (D. Mass. Sept. 22, 2010).[5]  Lenders servicing mortgages not owned or guaranteed by Fannie Mae or Freddie Mac may elect to participate in HAMP by executing a Servicer Participation Agreement with Fannie Mae in its capacity as financial agent for the United States.  (*See* Announcement 09-05R, at 2).

---

[3] *See* Fannie Mae Single Family 2011 Selling Guide, § A2-1-01 (effective Apr. 1, 2009), *available at* https://www.efanniemae.com/sf/guides/ssg/sg/pdf/sel062811.pdf; Fannie Mae Single Family 2011 Servicing Guide, Pt. I, Ch. 2, § 201 (effective Jun. 1, 2007), *available at* https://www.efanniemae.com/sf/guides/ssg/svcg/svc061011.pdf.

Citations in this opinion to provisions of the Selling Guide and Servicing Guide will refer to version of the provision in effect in late 2009 through October 2010, the time during which the relevant events at issue in this case occurred.

[4] *See* Fannie Mae Single Family Mortgage Selling and Servicing Contract, § V(A)(3) ("Any mortgage serviced under this Contract, which we own or in which we have purchased a participation interest, must be serviced by the Lender according to the provisions in our Guides that are in effect on the date of this Contract or as amended in the future.")).

[5] *See* Fannie Mae Single Family 2011 Servicing Guide, Pt. VII, § 609 (effective Apr. 21, 2009) ("All servicers must participate in HAMP for all eligible mortgage loans held in Fannie Mae's portfolio or that are part of an MBS pool that has the special servicing option or a shared-risk MBS pool for which Fannie Mae markets the acquired property.").

The Department of the Treasury and Fannie Mae have issued a series of directives that provide guidance to mortgage servicers implementing HAMP.  Under the guidelines, servicers may identify and solicit borrowers who are in default on their mortgage payments, or soon will be, and evaluate their eligibility to participate in HAMP.  (*See* Announcement 09-05R, at 1-3, 14-15). A borrower may be eligible for a HAMP modification if, among other things, her mortgage loan originated before January 1, 2009; the mortgage is secured by her primary residence; the mortgage loan has not previously been modified under HAMP; and the mortgage payments amount to more than 31% of the borrower's gross monthly income.  (*See id.* at 2-3).  To participate in HAMP, borrowers must open an escrow account and submit, among other documents, an affidavit attesting to financial hardship.  (*Id.* at 3-4).  The servicer conducts a Net Present Value test, which assesses whether the expected cash flow from a modified loan would exceed the cash flow from the unmodified loan.  (*Id.* at 6-7); *see also Alpino v. JPMorgan Chase Bank, N.A.*, 2011 WL 1564114, *2 (D. Mass. Apr. 21, 2011).

If the homeowner qualifies under these eligibility criteria, the guidelines direct the servicer to offer that individual a Trial Period Plan ("TPP").  (*See* Announcement 09-05R, at 20-21; *see also* Fannie Mae Announcement 09-25, at 1-4).  Under the TPP, the homeowner undertakes to pay modified mortgage payments, calculated based on financial documentation submitted during the eligibility phase, for a three-month trial period.  The standard-form TPP represents to borrowers that they will obtain a permanent modification at the end of the trial period if they comply with the terms of the agreement.  *See* Fannie Mae Single Family 2011 Servicing Guide, Pt. VII, Ch. 6, § 609.04.07 (effective Jun. 1, 2010).

A servicer participating in HAMP may not proceed with a foreclosure sale on a property

4

in default until the borrower has been evaluated for HAMP eligibility.  (Announcement 09-05R, at

16).  The guidelines require servicers to "use reasonable efforts to contact borrowers facing

foreclosure to determine their eligibility."  (*Id.*).

## II.   <u>Factual Background</u>

For the purposes of deciding the motion, the Court takes as true all well-pleaded facts in

the complaint.

Plaintiffs Derek and Becky Markle reside at 33 Milk Street in Blackstone, Massachusetts.

In 2006, they refinanced their original mortgage loan by obtaining a new loan from defendant

HSBC Mortgage Corporation (USA) in the amount of $318,000.  (Compl. ¶ 13).  The loan was

secured by a mortgage on their home in the name of Mortgage Electronic Registration Systems,

Inc., presumably as nominee for the lender.  (*See id.*).  The mortgage is presently serviced by

HSBC on behalf of Fannie Mae, the current owner of the mortgage note.  (*Id.* ¶¶ 14, 19).

The Markles allege that HSBC and Fannie Mae have entered into a Mortgage Selling and

Servicing Contract.  (*Id.* ¶ 35; *see also* Mot. Opp., Ex. C).[6]  As described, the MSSC requires

HSBC to comply with the Selling and Servicing Guides and to participate in HAMP for mortgage

notes owned by Fannie Mae, which would include that of the Markles.  (Compl. ¶¶ 22, 35, 40).

Sometime after the 2006 refinancing, the Markles experienced a period of financial

---

[6] The complaint makes reference to the contract and provides a link to a website that supposedly contains the contract.  (Compl. ¶¶ 21, 37).  The Court, however, cannot locate a copy of any contract between Fannie Mae and HSBC on the website.  Attached to plaintiffs' opposition to the motion to dismiss is a template version of Fannie Mae's Mortgage Selling and Servicing Contract, but the template is not the contract executed by HSBC and Fannie Mae.

Nevertheless, HSBC does not dispute that it entered into the MSSC with Fannie Mae or that it is a participant in HAMP.  For the purposes of deciding the motion to dismiss, the Court takes as true the allegation that HSBC and Fannie Mae entered into the template version of the MSSC attached the motion to dismiss, which incorporates Fannie Mae's Selling Guide and Servicing Guide.

hardship when Mrs. Markle lost her job and family medical bills began to accumulate.  (Compl. ¶ 15).  As a result, they defaulted on their monthly mortgage payments.  (*Id.* ¶ 15).[7]  HSBC eventually scheduled a foreclosure sale of their home for September 28, 2010.  (*Id.* ¶ 24).

The Markles allege that HSBC did not evaluate their eligibility to obtain a permanent loan modification under HAMP before scheduling the foreclosure sale.  (*Id.* ¶ 23, 44a).[8]  They also allege, in possible contradiction, that HSBC wrongfully denied them a permanent loan modification and did not disclose to them the NPV data on which it relied to determine their ineligibility for HAMP.  (*Id.* ¶¶ 44b, 44c).

On June 10, 2010, plaintiffs' counsel mailed a demand letter to HSBC pursuant to Mass. Gen. Laws ch. 93A, § 9(3).  (Compl., Ex. C).  The letter charged that Mr. Markle submitted an application for a loan modification under HAMP, and that HSBC improperly denied his application.  It also alleged that his counsel requested the NPV data used to evaluate the application, but HSBC did not furnish the information.  The letter asserted that HSBC's denial of Mr. Markle's HAMP application and failure to provide NPV data were unfair and deceptive trade practices.  (*See id.*).

HSBC's response letter, dated August 24, 2010, stated that, on the basis of Mr. Markle's HAMP application, HSBC offered the Markles a loan modification agreement in April 2010.  (*See* Compl., Ex. D).  Two months after the offer was made, according to the letter, HSBC informed the Markles that their request for a loan modification would no longer be approved because they

---

[7] The Markles allege that their financial position has improved recently and that they are now able to make their monthly mortgage payments.  (Compl. ¶ 17).

[8] Apart from the allegations made in the ch. 93A demand letter and response, there is no indication in the complaint that the Markles requested HSBC to review their eligibility for HAMP or that they applied to HSBC for a loan modification under HAMP.

had not executed the agreement or complied with its terms. (*Id.*). Against this factual backdrop,

HSBC denied that it had engaged in unfair or deceptive business practices and denied liability

under chapter 93A.

Plaintiffs filed a complaint against HSBC in September 2010. They assert claims for (1)

breach of contract on a third-party beneficiary theory, (2) breach of the implied covenant of good

faith and fair dealing, (3) negligence, and (4) a violation of the Consumer Protection Act, Mass.

Gen. Laws ch. 93A. They seek an order instructing HSBC to evaluate their mortgage loan for

HAMP eligibility or otherwise provide an alternative to foreclosure, and to offer a loan

modification consistent with HAMP guidelines. In addition, they seek a declaration that HSBC

has violated ch. 93A, as well as damages, costs, and attorney's fees. Sometime after the

complaint was filed but before September 28, HSBC cancelled the foreclosure sale.

## III.    <u>Standard of Review</u>

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth

of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom."

*Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*,

175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the plaintiff must state a claim

that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is,

"[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on

the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at

555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*,

129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if

plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

## IV.   Analysis

### A.   Third-Party Breach of Contract Claim

The breach of contract claim relies on the theory that plaintiffs are entitled to enforce the MSSC as third-party beneficiaries.  The HAMP guidelines, which apply to HSBC through the MSSC and the Servicing Guide, prohibit lenders from proceeding to foreclosure if a homeowner has not been evaluated for a loan modification.  Plaintiffs allege that HSBC breached its contract with Fannie Mae when it scheduled the foreclosure sale without first assessing their eligibility for a HAMP modification or otherwise considering an alternative to foreclosure.  Defendant contends that the MSSC confers no enforceable rights on plaintiffs as third-party beneficiaries.

### 1.   Governing Law

Whether federal or state law governs interpretation of the MSSC is a matter of some disagreement among federal courts.  *Compare Speleos*, 755 F. Supp. 2d at 307 (applying federal law in a HAMP case), *and Hammonds v. Aurora Loan Servs. LLC*, 2010 WL 3859069, *2 (C.D. Cal. Sept. 27, 2010) (same), *with Fellows v. CitiMortgage, Inc.*, 710 F. Supp. 2d 385, 406 (S.D.N.Y. 2010) (applying state law to a third-party beneficiary claim under the MSSC in a non-HAMP context), *and* McKensi, 2010 WL 3781841, at *5 (applying state law in a HAMP case). As the basis for federal jurisdiction is the diverse citizenship of the parties, 28 U.S.C. § 1332, the normal presumption is that state law governs.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). But it is also generally established that federal common law controls the interpretation of

contracts entered into pursuant to federal law and to which the United States is a party.  *See, e.g.*, *County of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1243 (9th Cir. 2009), *rev'd on other grounds*, 131 S. Ct. 1342 (2011).[9]

The Court need not determine whether federal or state law governs the interpretation of the MSSC, however, because both Massachusetts law and federal common law follow the Restatement (Second) of Contracts to assess the rights of third-party beneficiaries.  *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210-11 (9th Cir. 1999) (federal common law); *Public Serv. Co. of N.H. v. Hudson Light & Power Dep't*, 938 F.2d 338, 341 (1st Cir. 1991) (citing *Rae v. Air-Speed, Inc.*, 386 Mass. 187, 194-95 (1982)) (explaining

---

[9] The caselaw is not entirely consistent regarding which law governs contracts entered into pursuant to a federal statute and to which the United States is a party.  *In Miree v. DeKalb County*, the Supreme Court considered a breach of contract claim brought by survivors of passengers who died in an airplane crash.  433 U.S. 25 (1977).  Federal jurisdiction was based on diversity of citizenship.  Plaintiffs alleged that they were intended beneficiaries of contracts between the Federal Aviation Administration and DeKalb County, Georgia, that restricted land use near airports.  They alleged that the county-owned garbage dump adjacent to the airport was not compliant with the contracts and attracted birds that caused the crash.  The Fifth Circuit, sitting en banc, applied federal common law and determined that the plaintiffs did not have standing to sue as third-party beneficiaries.  *Id.* at 27-28.  The Court concluded that Georgia law governed interpretation of the contracts because the case raised no questions regarding the rights or duties of the United States, did not threaten the federal fisc, and presented only a speculative federal interest.  *Id.* at 28-33.  Nevertheless, the Court acknowledged that federal common law may apply in diversity cases when "a uniform national rule is necessary to further the interest of the Federal Government."  *Id.* at 29.

In a case more factually similar to the one at hand, the Seventh Circuit distinguished *Miree* and applied federal common law to a third-party beneficiary claim for the breach of contracts between the Illinois Housing Development Authority and low-income housing developers that was authorized by federal law and approved by the Department of Housing and Urban Development.  *Price v. Pierce*, 823 F.2d 1114, 1117-18 (7th Cir. 1987).  The plaintiffs alleged that the developers breached a contractual obligation to set aside 40% of newly-constructed housing developments as low-income housing.  Concluding that federal common law controlled (and that the case arose under federal law), Judge Posner reasoned that Congress would have desired federal courts to apply a uniform rule to third-beneficiary claims had it considered the matter.  *Id.* at 1120.  The court distinguished *Miree* as a case presenting a weaker federal interest; by contrast, where contracts implicated housing issues of national importance,  "the desirability of a uniform interpretation" necessitated that courts apply federal common law.  *Id.*

Since *Price*, several courts of appeals have applied federal common law to nonparty breach of contract claims where the contract implicated a federal interest, where the United States was a party to the contract, and where the contract was entered into pursuant to federal law.  *See, e.g.*, *Smith v. Central Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1034 (9th Cir. 2005); *Almond v. Capital Props., Inc.*, 212 F.3d 20, 24 (1st Cir. 2000).

Massachusetts law); *Massachusetts v. Mylan Labs.*, 357 F. Supp. 2d 314, 326 (D. Mass. 2005)

(federal common law); *Harvard Law Sch. Coalition for Civil Rights v. President & Fellows of*

*Harvard College*, 413 Mass. 66, 71 (1992) (Massachusetts law).

The intent of the contracting parties is the central inquiry in determining whether a

nonparty may maintain an action as a third-party beneficiary. *See McCarthy v. Azure*, 22 F.3d

351, 362 (1st Cir. 1994). A contract may be made for the direct benefit of a nonparty or may

indirectly benefit a nonparty. Different rights inhere in these distinct classes of beneficiaries; the

former are termed "intended beneficiaries," and the latter are termed "incidental beneficiaries."

*See Klamath*, 204 F.3d at 1210-11. The Restatement explains the difference between intended

beneficiaries and incidental beneficiaries as follows:

> Unless otherwise agreed between promisor and promisee, a beneficiary of a
> promise is an intended beneficiary if recognition of a right to performance in the
> beneficiary is appropriate to effectuate the intention of the parties and either (a) the
> performance of the promise will satisfy an obligation of the promisee to pay money
> to the beneficiary; or (b) the circumstances indicate that the promisee intends to
> give the beneficiary the benefit of the promised performance. . . . An incidental
> beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302 (1981). While an intended beneficiary of a promise has

standing to enforce a duty of performance, an incidental beneficiary acquires no rights against the

contracting parties. *See id.* §§ 304, 315; *Miller v. Mooney*, 431 Mass. 57, 62 (2000).

If the terms of the contract are clear, the parties' intent is ascertained from the contract

itself. *Klamath*, 204 F.3d at 1210. An intended beneficiary need not be specifically named in the

contract, however, so long as he falls "within a class clearly intended by the parties to benefit from

the contract." *Mylan Labs.*, 357 F. Supp. 2d at 326; *see also Klamath*, 204 F.3d at 1211. If the

contract is unclear, a court may assess the parties' intent by inquiring into the reasonableness of

10

the putative beneficiary's reliance on the intent manifested in the promise. *See* Restatement §

302(1)(b) cmt. d; *Hudson Light & Power*, 938 F.2d at 342.

Absent clear intent to the contrary, public citizens who benefit from a government contract

are presumed to be incidental beneficiaries. *See* Restatement § 313(2) & cmt. a; *Klamath*, 204

F.3d at 1211; *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 288 (D.C. Cir. 1993); *Speleos*, 755

F. Supp. 2d at 308.  And conferral of third-party beneficiary status on a nonparty to a government

contract must be consistent with the terms of the contract and the policy underlying it. *See*

Restatement § 313(2)(b); *Speleos*, 755 F. Supp. 2d at 308.

### 2.    Application

The Court begins with the text of the MSSC and its incorporated guides.  An enforcement

clause in the MSSC provides, "These rights and remedies are for our benefit and that of our

successors and assigns."  Fannie Mae Single Family Mortgage Selling and Servicing Contract, §

XIV.  The clause contains no clear indication that the contracting parties intended any other

party—excepting their successors and assigns—to enforce rights and remedies in the contract.

*See Speleos*, 755 F. Supp. 2d at 310.  Even more to the point, the Selling Guide states, "No

borrower or other third party is intended to be a legal beneficiary of the MSSC or the Selling

Guide or Servicing Guide or to obtain any rights or entitlements through Fannie Mae's lender

communications or contracts."  Fannie Mae Single Family 2011 Selling Guide, § A2-1-01

(effective Apr. 1, 2009).  This plain language undercuts the argument that plaintiffs are intended

third-party beneficiaries of the contract.  To the contrary, it appears clear that the contracting

parties did not intend to extend enforcement rights to third parties.  Indeed, it identifies a class of

individuals—borrowers—upon whom the contract specifically does *not* confer enforceable rights or entitlements.

Plaintiffs point to no other provision of the MSSC or of either guide to rebut this straightforward language. Instead, they argue that homeowners must be intended beneficiaries of the MSSC because the purpose of HAMP is to assist homeowner-borrowers at risk of default and foreclosure. Plaintiffs are undoubtedly correct that they are within the class of individuals that Congress and the Treasury Department intended to benefit by enacting the EESA and creating HAMP. But they overlook the important difference between an intent to benefit borrowers and an intent to confer upon borrowers a right to enforce servicers' HAMP obligations.

The clear language of the MSSC and the Selling Guide precludes a finding that plaintiffs are intended beneficiaries. Put another way, it would be unreasonable for a borrower to rely on the HAMP guidelines as evidence of intent to extend a right of enforcement to third-party beneficiaries, when the Selling Guide states that it is not so. Plaintiffs have not offered evidence of any intent, much less clear intent, sufficient to overcome the presumption that they are merely incidental beneficiaries of the MSSC. *See* Restatement § 313(2) & cmt a. If plaintiffs were third-party beneficiaries, every homeowner-borrower in the United States who has defaulted on mortgage payments or is at risk of default could become a potential plaintiff. Finding such a broad and indefinite a class of third-party beneficiaries would be inconsistent with the clear intent standard for government contracts set by the Restatement. *See id.*

The determination that homeowners are not intended beneficiaries of the MSSC comports with the conclusion reached by other courts in this district to have considered the question. *See Speleos*, 755 F. Supp. 2d at 310; *cf. In re Bank of America Home Affordable Modification*

*Program (HAMP) Contract Litigation*, 2011 WL 2637222, *3 (D. Mass. Jul. 6, 2011) (determining that a Servicer Participation Agreement does not extend to homeowners standing to assert a breach of contract claim as third-party beneficiaries); *Blackwood v. Wells Fargo Bank, N.A.*, 2011 WL 1561024, *6 (D. Mass. Apr. 22, 2011) (same); *Alpino*, 2011 WL 1564114, at *3-4 (same).  It is also the conclusion reached by the vast majority of courts outside the district that have analyzed third-party beneficiary claims under the MSSC and the Servicer Participation Agreement.  *See, e.g.*, *Cade v. BAC Home Loan Serv., LP*, 2011 WL 2470733, *2 n.2 (S.D. Tex. Jun. 20, 2011) (collecting cases in the HAMP context); *Edwards v. Aurora Loan Serv., LLC*, 2011 WL 2340939, *5 (D.D.C. Jun. 14, 2011) (same); *Hoffman v. Bank of America, N.A.*, 2010 WL 2635773, *3 (N.D. Cal. Jun. 30, 2010) (same); *Wells Fargo Bank, N.A. v. Sinnott*, 2009 WL 3157380, *11-12 (D. Vt. Sept. 25, 2009) (citing non-HAMP cases rejecting third-party beneficiary claims under the guides incorporated into the MSSC).

The Court notes that plaintiffs' third-party beneficiary breach of contract claim is materially different from a claim premised on the alleged failure to abide by the terms of a Trial Period Plan.  This Court has previously denied motions to dismiss breach of contract claims brought by plaintiffs who entered into a TPP with a mortgage servicer and complied with its terms, but who were not offered permanent loan modifications or issued any decision at all.  *See Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 351-53 (D. Mass. 2011); *Stagikas v. Saxon Mortg. Servs., Inc.*, 2011 WL 2652445, *4-5 (D. Mass. Jul. 5, 2011); *see also In re Bank of America HAMP Contract Litigation*, 2011 WL 2637222, at *3-4; *Durmic v. J.P. Morgan Chase Bank, N.A.*, 2010 WL 4825632, *3-4 (D. Mass. Nov. 24, 2010).  A TPP is a contract between a homeowner and a mortgage servicer.  As a party to the contract, the homeowner has

13

standing to seek enforcement of contractual promises made by the servicer, so long as enforcement is compatible with the objectives of HAMP. By contrast, plaintiffs in this case are not parties to the MSSC, and seek to enforce its provisions in contradiction to the intent of the contracting parties.[10]

Because plaintiffs do not have standing as third-party beneficiaries to enforce the terms of MSSC, the motion to dismiss the breach of contract claim will be granted.

### B.    Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

"Every contract implies good faith and fair dealing between the parties to it." *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 569-70 (2010) (quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991)). The implied covenant requires that

---

[10] The Supreme Court's recent decision in *Astra USA, Inc. v. Santa Clara County* is not to the contrary. 131 S. Ct. 1342 (2011). *Astra* arose out of a provision of the Public Health Services Act, 42 U.S.C. § 256b, that authorizes the Secretary of Health and Human Services to enter into form Pharmaceutical Pricing Agreements ("PPAs") with drug manufacturers that opt into a discounted drug incentive program. PPAs set price ceilings for the sale of medications to certain health care facilities. Santa Clara County, the plaintiff, operated public health care centers that were eligible under the statute for reduced-price medications. Asserting that drug manufacturers breached contractual obligations by overcharging the healthcare centers for medications, the county brought suit as an alleged intended beneficiary of the relevant PPAs. *Id.* at 1347.

The Court held that the county was not entitled to enforce the PPAs as a third-party beneficiary. The Court explained that because the language of the PPAs was nonnegotiable and merely incorporated drug manufacturers' obligations outlined § 256b, a suit to enforce terms within a PPA would be indistinguishable from a suit to enforce the statute. *Id.* at 1348. The statute, however, did not contain a private right of action. The Court reasoned that recognition of nonparty standing to enforce the terms of a PPA would undermine Congress's choice not to include a right of action, and furthermore would be incompatible with the statutory enforcement scheme. *See id.* at 1348.

By contrast, the EESA and subsequent statutes authorizing HAMP do not prescribe terms for TPPs (or for the uniform MSSCs and Servicer Participation Agreements). The broadly-worded statutory directives grant discretion to the Secretary of Treasury to formulate loss-mitigation and foreclosure-prevention initiatives. A suit to enforce a TPP—a contract that exists between an individual homeowner-borrower and a mortgage servicer—would differ substantially from a suit to enforce any provision in the EESA. Furthermore, while Treasury and Fannie Mae have developed a standardized TPP, the terms of TPPs vary with the distinct mortgage obligations of each homeowner. While the statute supplied the obligation to be enforced in *Astra*, the TPP (not the statute) supplies servicers' loan modification obligations. And, unlike in *Astra*, it is uncertain whether suits to enforce servicers' TPP obligations would help or hinder enforcement mechanisms.

contracting parties refrain from "do[ing] anything that will have the effect of destroying or injuring the right of the other party to its fruits of the contract." *Id.* (quoting *Anthony's Pier Four*, 411 Mass. at 471-72). The complaint alleges that the contract claim underlying the implied covenant to the breach of contract claim alleged in Count 1. (Compl. ¶ 50).[11] But the covenant only "governs conduct of parties after they have entered into a contract; without a contract, there is no covenant to be breached." *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 230 (1st Cir. 2005). Because plaintiffs are neither parties to the MSSC nor intended beneficiaries of it, defendant owes them no duty under the implied covenant. Count 2 will therefore be dismissed.

### C.   Negligence Claim

In count 3, plaintiffs allege that defendant's failure to evaluate their eligibility for a HAMP modification before instituting foreclosure proceedings constitutes negligence under Massachusetts law. A claim for negligence must allege that defendant (1) owed plaintiffs a legal duty, (2) breached that duty, and (3) was the proximate or legal cause of (4) actual damage or injury. *Jorgensen v. Massachusetts Port Auth.*, 905 F.2d 515, 522 (1st Cir. 1990). Defendant maintains that no legal duty imposes liability on mortgage servicers for failing to evaluate

---

[11] Plaintiffs' memorandum in opposition to the motion to dismiss argues that the mortgage and promissory note are the contract from which the implied covenant of good faith and fair dealing claim derives. But the complaint clearly identifies the relevant contract as tied to Count 1 of the complaint, which alleges that defendants failed to evaluate plaintiffs for HAMP eligibility or denied their HAMP application and did not furnish NPV data. Nowhere in the complaint do plaintiffs allege that defendant breached obligations in their mortgage or promissory note, nor does the complaint even refer to these two documents. As the argument in the opposition memorandum does not follow from the complaint, the Court will not address it at length. It suffices to point out that it the mortgage and promissory note likely do not impose on the servicer an obligation to modify the loan. *See Speleos*, 755 F. Supp. 2d at 312. Nor can the mortgage and promissory note be said to incorporate the HAMP guidelines or impose on the servicer a duty to offer a HAMP modification, as the documents were executed before the EESA was enacted. *Id.*

borrowers for HAMP modifications before moving to foreclose.  It urges the Court to dismiss the claim as an attempt to manufacture a private right of action under HAMP, when in fact none exists.[12]

Notwithstanding the absence of a right of action under HAMP, plaintiffs insist that they may pursue a common-law claim of negligence for a violation of its implementing guidelines. They contend that the Helping Families Save Their Homes Act of 2009, Pub. L. No. 111-22, § 201, 123 Stat. 1638 (2009), is the source of defendant's legal duty not to initiate foreclosure proceedings prior to a HAMP-eligibility evaluation.  Section 201 of the Act contains congressional findings that the mortgage foreclosure crisis has deprived Americans of their homes, destabilized property values, and crippled local economies.  *See id.* § 201(a)(1).  To forestall the impact of the crisis and stabilize property values, Congress concluded that mortgage servicers must be authorized to modify loans consistent with, among other EESA-authorized initiatives, the HAMP guidelines and objectives.  *Id.* § 201(a)(2)(A)(i).  In addition, Congress found, servicers must be given a safe harbor from liability to enable them to pursue residential loan modifications.  *Id.* § 201(a)(2)(B).

Accordingly, section 201 of the Act amended the Truth in Lending Act to prescribe that, to the extent that a mortgage servicer owes a duty to investors to maximize the value of residential mortgages, the duty is satisfied when the servicer modifies such mortgages consistent with HAMP criteria.  *See* 15 U.S.C. § 1639a(a).  It exempts servicers from liability to investors

---

[12] Neither the EESA nor HAMP guidelines provide a private right of action.  *See, e.g., Hart v. Countrywide Home Loans, Inc.*, 735 F. Supp. 2d 741, 748 (E.D. Mich. 2010); *Hoffman v. Bank of America, N.A.*, 2010 WL 2635773, *5 (N.D. Cal. June 20, 2010); *Gonzalez v. First Franklin Loan Servs.*, 2010 WL 144862, *18 (E.D. Cal. Jan. 11, 2010).

for completing HAMP modifications and includes a safe harbor provision for any individual who

cooperates with a servicer to effectuate a loss mitigation plan, such as a modification under

HAMP.  *Id.* § 1639a(b), (d).  The statute also provides, "The qualified loss mitigation plan

guidelines issued by the Secretary of the Treasury under the Emergency Economic Stabilization

Act of 2008 constitute standard industry practice for purposes of all Federal and State laws."  *Id.*

§ 1639a(c).

Plaintiffs seize on this latter provision and insist that it establishes a legal duty of care for

servicers to comply with HAMP guidelines, or else face lawsuits sounding in state tort law.  This

argument is without merit.  While the statute evinces an intent to encourage servicers to modify

loans under HAMP, it likewise aims to protect servicers from liability for participating in HAMP

and other loss-mitigation initiatives.  Far from establishing a new duty of care that would cast a

wider net of liability under state-law negligence claims, the statute removes a legal barrier to more

widespread loan modification activity so as to encourage servicers to participate in HAMP and

related programs.  *Accord Jones v. Premier One Funding, Inc.*, 2010 WL 841277, *3 (N.D. Cal.

Mar. 10, 2010).

Plaintiffs do not cite to any Massachusetts authority recognizing a duty of care set by

HAMP guidelines, the breach of which would expose servicers to liability.  It is true, as plaintiffs

point out, that under Massachusetts law a statutory or regulatory violation can supply evidence of

negligence.  *See Berish v. Bornstein*, 437 Mass. 252, 273 (2002); *Campbell v. Leach*, 352 Mass.

367, 371 (1967).  But, as another court in this district recently explained, "while [the] violation of

[HAMP guidelines] may provide evidence of a duty *otherwise owed*, it does not create such a

duty in the first place."  *Brown v. Bank of America Corp.*, 2011 WL 1311278, *4 (D. Mass. Mar.

17

31, 2011); *but see Speleos*, 755 F. Supp. 2d at 311 (finding that the HAMP guidelines may establish a duty of care, the breach of which may state a negligence claim).

The Court will decline the invitation to recognize in the HAMP guidelines a new duty of care, thus far unrecognized by Massachusetts courts.  To find a legal duty within the Helping Families Save Their Homes Act—a duty that would expose mortgage servicers to expanded liability under HAMP—would not accord with Congress's intent.  Count 3 will therefore be dismissed.

> **D.**     **Chapter 93A Claim**

Finally, plaintiffs contend that defendant's failure to evaluate plaintiffs for HAMP eligibility was an unfair or deceptive violation of the Massachusetts Consumer Protection Act. The statute prohibits "unfair or deceptive acts of practices in the conduct of any trade or commerce."   Mass. Gen. Laws ch. 93A, § 2.  "To prevail on a Chapter 93A claim, [a] plaintiff 'must prove that a person who engaged in trade or business committed an unfair or deceptive trade practice and that the [plaintiff] suffered a loss of money or property as a result.'"  *Morris v. BAC Home Loans Serv., L.P.*, 2011 WL 1226974, *3 (D. Mass. Apr. 4, 2011) (quoting *Brandon Assocs., LLC v. FailSafe Air Safety Sys. Corp.*, 384 F. Supp. 2d 442, 446 (D. Mass. 2005)).

This Court determined in *Bosque* that even though no private right of action exists under HAMP, a violation of the HAMP guidelines may nonetheless, under some circumstances, provide a basis for a claim under chapter 93A.  *See* 762 F. Supp. 2d at 353-54.  Other courts in this district have also concluded that the absence of a private right to enforce HAMP does not automatically preclude chapter 93A claims predicated on the failure to comply with HAMP obligations.  *See In re Bank of America HAMP Contract Litigation*, 2011 WL 2637222, at *5;

18

*Kozaryn v. Ocwen Loan Serv., LLC*, 2011 WL 1882370, *2-3 (D. Mass. May 17, 2011);

*Blackwood*, 2011 WL 1561024, at *3-4; *Morris*, 2011 WL 1226974, at *3; *Ording v. BAC Home Loans Serv., LP*, 2011 WL 99016, *7 (D. Mass. Jan. 10, 2011).

Nevertheless, merely alleging a violation of the HAMP guidelines is not sufficient to state a claim under chapter 93A. A plaintiff must also allege that the violation is unfair or deceptive and that recovery is compatible with the objectives of enforcement mechanisms contained in the underlying statute. *See, e.g.*, *Morris*, 2011 WL 1226974, at *3, 6; *Ording*, 2011 WL 99016, at *7 (citing *Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co.*, 56 Mass. App. Ct. 853, 858 (2002)). Allegations that defendants misrepresented to plaintiffs the status of their HAMP application, their rights under HAMP, or their eligibility for a permanent loan modification; misrepresented to plaintiffs the likelihood or imminency of foreclosure; or actually conducted a foreclosure sale in violation of HAMP guidelines have been found sufficiently unfair or deceptive to state a claim under chapter 93A. *See Bosque*, 762 F. Supp. 2d at 353-54; *In re Bank of America HAMP Contract Litigation*, 2011 WL 2637222, at *5; *Blackwood*, 2011 WL 1561024, at *4.

Plaintiffs in this case have alleged that defendant (1) failed to evaluate their eligibility for a HAMP modification before referring their home to foreclosure, (2) improperly denied them a loan modification, and (3) did not furnish requested NPV data. These allegations, if taken as true, may state a violation of the HAMP guidelines. Plaintiffs have not pleaded any additional facts suggesting that defendant engaged in unfair or deceptive business practices. The complaint only asserts that the violation themselves—the failure to evaluate plaintiffs, the denial of a HAMP

modification, and the inability to obtain NPV information—are the unfair or deceptive acts that undergird the chapter 93A claim.  (*See* Compl. ¶¶ 61, 62).

These meager allegations are not sufficient to state a claim under chapter 93A.  *Accord Morris*, 2011 WL 1226974, at *7 (concluding that allegations that a servicer "ignored or failed to evaluate [plaintiff's] HAMP application" are insufficient to state a chapter 93A claim).   Plaintiffs have not alleged that defendant misrepresented any relevant fact, improperly foreclosed on their home, or otherwise behaved unethically or unscrupulously.  The claim is only based on the failure to evaluate plaintiffs' eligibility for HAMP and the decision not to offer to them a HAMP modification.  But, even assuming these actions are not compliant with HAMP,  "not every technical violation of HAMP should expose a servicer to Chapter 93A liability."  *Id.* at *7.  And clerical error alone cannot sustain a chapter 93A claim.  *See, e.g.*, *Kozaryn*, 2011 WL 1882370, at *3; *Brown*, 2011 WL 1311278, at *3 (citing *Baena v. KPMG LLP*, 453 F.3d 1, 3 (1st Cir. 2006)).  Nor is there any indication that plaintiffs suffered harm that would rise to the level of a chapter 93A violation.  Defendant cancelled the September 2010 foreclosure sale, and the Court is not aware that any other sale has been scheduled.  *See Brown*, 2011 WL 1311278, at *3 (dismissing a chapter 93A claim when the defendant allegedly misstated an aspect of the plaintiff's HAMP application, but caused her no actual harm).[13]

---

[13] Because plaintiffs have not sufficiently alleged that defendant's HAMP violations were unfair or deceptive, the Court need not address the compatibility of recovery under chapter 93A and the objectives and enforcement mechanisms of the statutory scheme.  Nevertheless, the Court implicitly decided in *Bosque* that recovery of damages under chapter 93A does not frustrate the EESA and HAMP goals of stabilizing the national housing market and helping homeowners to avoid foreclosure through loan modifications.  *See* 762 F. Supp. 2d at 353-54.  Other courts in this district have explicitly determined that HAMP is compatible with chapter 93A claims.  *See Blackwood*, 2011 WL 1561024, at *4; *Morris*, 2011 WL 1226974, at *5.

As the complaint does not sufficiently allege a violation of chapter 93A, the claim will be dismissed.

**V.**  **Conclusion**

For the foregoing reasons, the motion to dismiss is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor

F. Dennis Saylor IV

Dated: July 12, 2011                          United States District Judge